## EAMES v. H. B. CLAFLIN CO. et al.

(Circuit Court of Appeals, Second Circuit. January 26, 1917.)

No. 46.

1. CUSTOMS AND USAGES ☞1—EFFECT—"CUSTOM"—"USAGE."

While "usage" and "custom" are often used synonymously, strictly speaking, "usage" is invoked to give meaning to a contract on the assumption that the parties contracted in reference thereto, if they knew of the usage, while "custom" is a length of usage which has become law, and which the parties are presumed to know.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 1.

For other definitions, see Words and Phrases, First and Second Series, Custom; Usage.]

2. CUSTOMS AND USAGES ☞3—EFFECT—GENERAL KNOWLEDGE.

To give usage the force of law, there must be acquiescence and notoriety from which it may be inferred that it was known to the public, though it may be only to a small portion of the public engaged in the particular business affected by the custom.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 2, 6.]

3. CUSTOMS AND USAGES ☞12(2)—PERSONS AFFECTED—OTHER BUSINESS.

Under some circumstances, the customs of business different from that of the person sought to be charged cannot be recognized against them without showing actual knowledge; but if one employs another to work after the method of transacting the other's business, he may be presumed to have intended the business to be performed according to the customs regulating it.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 24.]

4. BROKERS ☞77—LIEN—"FACTOR"—"GOODS."

A note broker, who according to the custom of the business gave the purchaser of notes an option to return after investigation of credit, and who became personally liable to the purchaser for the return of the purchase price, though such liability was not a custom of the business and

was not known to his principal, is not entitled to a factor's lien on all notes of his principal in his possession for the amount paid by him on return of certain notes after the insolvency of the principal, since, while he is within the old definition of a "factor" as one to whom goods are consigned to sell by a merchant at a distance from the place of sale, if notes are considered goods, the expression "goods" in the old law was limited to chattels, and did not include choses in action, and the lien, which is no longer of value to the merchant, but only to the factor in cases of insolvency of the merchant, will not be extended beyond its original limits.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 98.

For other definitions, see Words and Phrases, First and Second Series, Factor; Goods.]

5. FACTORS ⬡⟿47(2)—LIEN—"EXPENSES AND ADVANCEMENTS."

If a note broker is considered a factor, amounts paid by him after his principal's insolvency, on return of notes sold by him for his principal with option to return, for which he had assumed personal liability, though that was not the custom of the business, and was not known to his principal, are not "expenses and advancements on the notes," for which alone a factor is given a general lien on all his principal's goods.

[Ed. Note.—For other cases, see Factors, Cent. Dig. § 66.]

Appeal from the District Court of the United States for the Southern District of New York.

Creditor's bill by John C. Eames against the H. B. Claflin Company. From an order of the District Court, requiring Hathaway, Smith, Folds & Co. to surrender· notes of the defendant in their possession, and on which they claimed a lien, the lien claimants appeal. Affirmed.

See,.also, 231 Fed. 693, 145 C. C. A. 579; 220 Fed. 190.

Appeal by Hathaway, Smith, Folds & Co. (hereinafter called Hathaway) from a final order entitled in the equity suit above named. The suit aforesaid is a creditor's bill to conserve, collect and distribute to those entitled the property of H. B. Claflin Company (hereinafter called Claflin), in which was made an order of June 24, 1914, appointing receivers of the Claflin Company, and vesting them with the right of possessing all the assets of that corporation.

The receivers filed a petition in the suit, against Hathaway, alleging that firm to have in possession a large amount of property, viz. the promissory notes of divers persons and corporations, belonging to Claflin, and praying that an order might pass directing Hathaway to surrender the same. Appellants appeared, and answered the petition, admitting possession and title, but claiming a lien upon said notes, etc. The District Court denied the lien, and entered the order against Hathaway, from which this appeal is taken.

For many years prior to failure in June, 1914, Claflin had been established in New York City, doing one of the largest businesses in wholesale dry goods, etc., in the country, and enjoying excellent credit. Hathaway was and long had been a firm of note brokers, doing business (especially) in New York and Chicago. In June, 1908, some of appellants personally saw the president of Claflin and undertook to sell promissory paper belonging to that company in Chicago and the regions thereabout. No special agreements other than as to rate of remuneration were made between Claflin and Hathaway then or thereafter. Appellants were employed as note brokers at a ,certain commission; nothing more was said or written. Between 1908 and 1914 Hathaway sold several million dollars worth of paper belonging to Claflin, collecting from whomsoever bought, and invariably remitting the proceeds of sale on the same or the following day to Claflin in New York. ·

On June 11, 1914, appellants in Chicago sold to the Corn Exchange Bank of that city notes made by divers persons to the order of Claflin, by that company indorsed in blank, and belonging to Claflin at the moment of sale—all to the face value of $127,174.49. For these notes the bank paid over to·

⬡⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes·

Hathaway face, less discount, or $124,746.43, which amount, less commissions and exchange, Hathaway on the same day sent to New York as usual. With the notes there was delivered to the bank by appellants a statement of the transaction in the following form:

"[Letterhead of Hathaway, Smith, Folds & Co.]
"Corn Exchange National Bank, Chicago, Ill.
"Hathaway, Smith, Folds & Co., Commercial Paper,
"137 South La Salle Street,
"Chicago 6/11/14.
"[Here follows a full description of the notes sold.] Indorsed by the H. B. Claflin Co. The above notes may be returned by delivery at our office during banking hours on or before  50 M 6/22/14
"50 M 7/ 1/14
"This option is given for credit investigation only.
"Hathaway, Smith, Folds & Co.,
"W. Edwards."

(Edwards was Hathaway's cashier; "50 M" means $50,000 face value notes. The figures following show that at the date of Claflin's failure one option had expired, but there still existed an option on $50,000 open to July 1, 1914.)

On June 11th the Corn Exchange Bank knew Hathaway as broker for Claflin, selling that company's property, to wit, notes; knew that it bought Claflin's property; and Hathaway knew of the bank's knowledge. The Claflin failure, and appointment of receivers, was known in Chicago, and to both the bank and appellants, on June 24th; the day following the bank tendered to Hathaway nine of the notes received on June 11th, and for which it had paid $49,517.68. This sum (less commission) Hathaway had already sent to Claflin Co. as above stated, but the nine notes were taken back, and appellants paid out of their own funds $49,517.68 to the bank.

Thus, on June 25th, appellants had the nine notes that day received, and also many others, admittedly belonging to Claflin and unsold at date of failure. The receivers' petition demanded all these notes, except the nine; Hathaway's answer sets up a lien on all the notes, including the nine, for the amount repaid the bank on June 25th. The pleaded basis for this lien is a custom to sell commercial paper "on option," which means that the purchaser has the right to return what he bought, or some of it, at any time within the option limit, to the broker, and get back "from the broker," the purchase price. On a sale with option it is alleged that the broker need not remit to his principal until expiry of option, but he frequently does so "where he has other paper of his principal in his hands for protection." The answer asserts that this custom was well known to Claflin, and that under it Hathaway's remittance on June 11th, of the proceeds of the nine notes, "was an overpayment, and in the nature of an advance"—giving rise to the lien relied on.

The evidence shows no mention of this custom in any dealings between appellants and Claflin. No special arrangements were made on June 11th between the bank and Hathaway; the latter did not assume personal liability to the bank otherwise than by delivery of the statement (Exhibit 4), which (plus inferences from subsequent conduct) is the only evidence of contract as between appellants and the bank.

Alfred B. Cruikshank, of New York City, for appellants Hathaway and others.

Henry Root Stern, of New York City, for appellees receivers of Claflin Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). Appellants herein urge that four propositions be resolved in their favor: (1) That the custom or usage of selling commercial paper with option

of return be recognized and accepted; (2) that Hathaway & Co. be held to have promised repayment to the Corn Exchange Bank from their own funds, if the option was exercised and paper returned; (3) that such a payment as Hathaway made to the bank is as matter of law an advance on account of the principal; and (4) that to the extent of such payment they are entitled to a general lien upon all Claflin's property in their possession. As no explicit contract, oral or written, stated any of these points as between Claflin and Hathaway, their legal relations depend wholly on establishment of the custom pleaded.

[1] Usage is ordinarily regarded as the evidence of custom, though the words are often used synonymously. But "strictly speaking, custom is that length of usage which has become law. It is a usage which has acquired the force of law, and ignorance of the law will not excuse. A general custom is the common law itself, or a part of it." Walls v. Bailey, 49 N. Y. 471, 10 Am. Rep. 407. Usage is invoked to give meaning to a contract, on the assumption that the parties contracted in reference thereto; yet, since there can be no intent without knowledge (actual or imputed) of what was intended, not only must proof be given showing that the usage relied upon exists, but the relation of the parties concerned must be shown to be such that knowledge of the usage in question may be inferred, and further that intent to be bound thereby may also be established by reasonable inference.

[2] As was said in Adams v. Otterback, 15 How. 545, 14 L. Ed. 805, to give usage "the force of law * * * requires an acquiescence and a notoriety, from which an inference may be drawn that it is known to the public," and, if to the public, then by fair presumption to that member of the public who must be held to have contracted in the light thereof. Yet a custom may be good and lawful without more than a small fraction of the world knowing anything of it; indeed, most customs or usages affect only a particular business, yet are nevertheless binding if certainty, continuity, reason, legality, and acquiescence are duly established.

[3] Under some circumstances the customs of those engaged in a business wholly different from that of the persons sought to be affected cannot be recognized as against said persons without showing actual knowledge thereof, for assent can be implied only from knowledge of the custom which it is claimed authorizes it. Great Western, etc., Co. v. White, 118 Fed. 410, 56 C. C. A. 388, and cases cited. But if one employs another to work in and after the method of transacting that other's business, then (though ignorant of such method) he may be presumed to have intended the business thus requested, to be performed according to usage. Walls v. Bailey, supra; Gleason v. Morrison, 20 Misc. Rep. 320, 45 N. Y. Supp. 684.

In this instance Hathaway was employed as a note broker to sell Claflin paper, and such brokerage is a well-known and independent occupation, quite capable of developing, sustaining, and enforcing its own customary business methods. A majority of this court consider the evidence submitted as fairly establishing (within the rules above laid down) that during the whole time of Hathaway's business con-

nection with Claflin there was a custom or usage of selling commercial paper with an option of return. That majority of the court further deem it proven as matter of fact that on June 11, 1914, Hathaway intended to become, and did become, personally responsible to the Corn Exchange Bank for the repayment to that bank of the price of any paper returned under the recited option. Both these findings are of fact, and render unnecessary consideration of decisions wherein it was sought to hold note brokers in invitum to similar liability. Union Trust Co. v. Whiton, 97 N. Y. 172; Commercial Bank v. Waters, 45 App. Div. 441, 60 N. Y. Supp. 981, affirmed 167 N. Y. 583, 60 N. E. 1109; Monticello Bank v. Bostwick, 71 Fed. 641. But we do not find sufficient evidence of any custom (or part of a custom) whereby brokers, on selling paper with option, superadd to the undoubted liability of their principals (in respect of a return) their own promise to repay in the first instance. From this finding of fact, it follows that no custom required or justified the act of Hathaway in assuming personal responsibility to the Corn Exchange Bank.

[4] As for such action, there were certainly no explicit contractual arrangements, to which Claflin was a party; appellants insist that a note broker is but one species of factor; and therefore entitled to that general lien, or lien in respect of the general balance of account, allowed to all factors as the result of an ancient custom which unquestionably has long since hardened into a part of the law. As put in Nagle v. McFeeters, 97 N. Y. 202, once establish the status of factor and "the law implies or infers the lien from the relation [of] the parties." Walker v. Burch, 6 T. R. 258. And this contention is thought to gain support from establishment of the option custom, to which lien would certainly be a convenient, and is said to be a necessary, adjunct.

It is not denied that the rather modern occupation of note or bill broking seems to respond to old definitions of the word "factor." He is (if notes are goods) "a person to whom goods are consigned for sale by a merchant * * * at a distance from the place of sale." Baring v. Corrie, 2 B. & A. 143. He is a mercantile agent (if notes are merchandise) to whom in the ordinary course of business is intrusted the possession of goods; and it is the fact of possession, which has always especially distinguished a factor from a broker. See In re Rabenau, 118 Fed. 471; Howland v. Woodruff, 60 N. Y. 80; United State v. Villalonga, 23 Wall. 42, 23 L. Ed. 64; Ommen v. Talcott, 188 Fed. 403, 112 C. C. A. 239; Jenks, English Civil Law, § 536. This resemblance is superficial and misleading, and the argument rests upon a hasty identification with the "goods, wares and merchandise" of historic law (always chattels) of what are evidences of indebtedness, actual or inchoate, and mere choses in action.

It is to be observed that a special lien upon the notes received back by Hathaway from the bank does not advance the matter. It may be assumed that any agent has a lien on movable property in his possession and belonging to his principal in respect of expenses incurred in relation to that particular property. Hammonds v. Barclay, 2 East, 227; Houghton v. Matthews, 3 Bos. & P. 494; Muller v. Pondir, 55

N. Y. 340, 14 Am. Rep. 259. But since the property here in question is negotiable paper, it is indifferent whether Hathaway now owns, or has a lien upon, the nine notes returned; those notes may be enforced against all parties liable thereupon; the brokers have all the rights of legal owners, whatever their technical appellation.

' The claim is that virtute officii, or by legal implication from their employment, note brokers have that general lien upon all their principal's property on hand for a general balance of account, which is the essential and peculiar characteristic of a factor. Upon authority there is nothing shown, or known to us, holding that a note broker is a factor; and it is both old and recent law that where a lien is claimed on a general account "it is to be taken strictly" (Houghton v. Matthews, supra), and where such lien is asserted under circumstances not previously recognized as conferring the same "we should be anxious to tread cautiously and on sure grounds before we extend beyond the limits of decided cases" (Matter of Heinsheimer, 214 N. Y. 368, 108 N. E. 636, Ann. Cas. 1916E, 384, and cases cited). The business of such brokers has not "a character known to the law with certain prescribed duties, but the employment is one which depends entirely on the course of dealing." Foster v. Pierson, 4 L. J. Exch. N. S. 125. The privilege now contended for has been demanded in Grant v. Taylor, 35 N. Y. Super. Ct. 351; but the court said:

"If there be a usage giving to persons engaged in * * * selling bills or notes, a lien for a general balance against their customer, such usage should be proved. It will not be presumed to exist in the absence of an express agreement."

And in this case there was no express agreement, and no established usage is proven.

It is urged upon us that Bank v. Levy, 1 McMullen (Law) 431, and Hodgson v. Payson, 3 Har. & J. (Md.) 339, contain expressions which recognize a factor's lien under circumstances said to be analogous to the present. In both cases a lien was granted, but in each the person asserting the same had at the request of his principal indorsed paper belonging to the principal, and (from somewhat imperfect reports) we are of opinion that the lien accorded was based, not upon the character of employment, but upon the fact of indorsement by request. See as to general lien, and the hostility of the law thereto, Mechem on Agency (2d Ed.) vol. 2, p. 1276; Jones on Liens (3d Ed.) § 422; Kent's Commentaries, vol. 2, pp. 634–636.

Considering the reason and history of the matter, a lien was not granted for the primary purpose of benefiting the agent who came to be known as a factor, but of assisting the principal, who, being at a distance, was obliged to confide the sale of his goods to some one upon the ground. The owner did not part with title, but he could not exercise immediate supervision of sales, and he ordinarily preferred to let the goods stand responsible for expenses and advances rather than to deposit with his factor agent cash in advance. The practice was thought to promote confidence in and liberality on the part of factors (Story on Agency [9th Ed.] § 378), and what most merchants

preferred came to be obligatory upon all; such is the common origin of much of what we loosely call the common law.

It was for the advantage, not of the principal alone, but of commerce generally, that the factor's lien should be recognized, as it long has been. But every improvement in communications, each advance in business ease, has rendered less necessary and desirable the creation of liens which nowadays are commonly useful to the agent alone, and then upon the insolvency of his principal, and are obviously detrimental to that class, always the largest and most to be regarded, who can and do deal with the principal only in the relation of debtor and creditor.

It is never more necessary to go behind titles, to get at substance, than when a new claim of right is made under an ancient name. It rather befogs the matter to dwell upon the similarities or differences between bill brokers and commission merchants—between dealers in commercial paper and mercantile factors. The name is nothing; what appellants want is not to be dubbed factors, but to have the right to a general lien annexed to one part of their business. Therefore the vital inquiry is whether that business, as the evidence shows it, was so conducted, in accordance with the rules of agency (of which factorage is but a subdivision), as to impose a lien under judgments of authority, or merit one by analogy thereto.

[5] That no lien is imposed by authority we have stated; but further it may well be doubted whether Hathaway's act, if performed by an undoubted factor, and in respect of chattels, would have been within the scope of such factor's authority as inferred from his employment. It is not true as matter of law that the lien urged upon us arose from paying over the proceeds of option sale to Claflin, which is the manner of pleading it; that lien arose, if at all, the moment Hathaway assumed liability on the option, and one test of the lien's worth is to ask whether such unrequested assumption was either an expense of sale, or an advance upon what the broker had for sale. "Expenses and advances" are words (in this connection certainly) of such simple meaning as to require no exposition, and it is obvious that Hathaway's contribution of his own financial worth to the option privilege, was neither an expense of sale, nor an advance upon the property committed to his care. What was neither expense nor advance has never been admitted as a matter for which any factor (virtute officii) could demand indemnity from his principal. If indemnity cannot be demanded, lien certainly fails.

The circumstances under which agents generally may demand reimbursement from principals were summarized in Frixione v. Tagliaferro, 10 Moo. P. C. 196; it must be shown that the agent's loss arose from the fact of agency, that the act productive of loss was within the scope of the agency, and was not attributable to the agent's default or laches. The scope of even a factor's authority has its limits (Commercial, etc., Bank v. Heilbronner, 108 N. Y. 439, 15 N. E. 701); those limits are the accomplishment of the principal's wishes, by means explicitly or impliedly agreed upon beforehand. Nothing explicit being pretended, the implication here demanded is of an act commer-

cially undesirable, and without analogy in the relation of a factor to his merchandise.

As appellants' asserted lien is in our opinion unsupported by authority, possesses merely a specious resemblance to a factor's lien, would be of doubtful validity if claimed for one employed by the name of "factor," and if allowed here would tend to confer on note brokers as a class privileges injurious to the business community as a whole, the order under review is affirmed, with costs.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes