## NICOLL v. PITTSVEIN COAL CO.

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

No. 65.

1. **Customs and usages** ⊙⟳7—Trade usage held reasonable and legal.

A usage in the business or trade of mining and selling coal of apportioning the coal pro rata among buyers when sufficient cars cannot be obtained to ship all that has been sold complies with the requirements of reasonableness, legality, etc.

2. **Customs and usages** ⊙⟳12(1)—Party's knowledge of particular trade usage immaterial.

That a buyer of coal knew of a trade usage in the business or trade of mining and selling coal to apportion coal among buyers pro rata, when sufficient cars could not be obtained to deliver all contracted for, was immaterial.

3. **Customs and usages** ⊙⟳1—Usage to apportion coal among buyers pro rata held not established custom, but trade usage.

A so-called custom in the business or trade of mining and selling coal to apportion coal pro rata among buyers when sufficient cars could not be obtained to deliver all contracted for is not an established custom, but a trade usage.

4. **Customs and usages** ⊙⟳1—Custom is part of common law, and usage is the law of the case.

A lawful custom is itself part of the common law, while a lawful usage proved and shown to affect both parties is the law of their case.

5. **Contracts** ⊙⟳152—Parties may employ words and phrases in particular sense.

The individual parties to a transaction may employ words or whole phrases in a particular sense, irrespective of their ordinary sense.

6. **Customs and usages** ⊙⟳21—Question is one of fact as to whether words were used in special sense.

When the parties to a contract are claimed to have contracted with reference to a trade usage, there is only a question of fact as to whether the parties were using words in a special mutual sense.

7. **Customs and usages** ⊙⟳19(2)—Ambiguity with respect to number, quantity, etc., unnecessary to admit evidence of usage.

With respect to number, quantity, amount, or measurement, ambiguity in the language of a contract is not necessary to let in evidence of usage.

8. **Customs and usages** ⊙⟳21—Notice on letter heads held to make incorporation of usage a question for the jury.

Where a contract for the sale of coal was made by telephone and confirmed by letter, and the buyer's letter head bore a notice that all agreements were contingent upon delays of carriers and the seller's that contracts were subject to car supply, it was a question for the jury whether the parties intended to incorporate a trade custom to apportion coal among contract buyers pro rata, when sufficient cars could not be obtained for delivery of the full amount sold.

9. **Sales** ⊙⟳88—Notice on letter head not part of contract as matter of law.

Where a contract for the sale of coal was made by letter, notices on the letter heads of the parties that agreements were contingent upon delays of carriers and subject to car supply were not, as matter of law, incorporated in and made part of the contract.

10. **Customs and usages** ⊙⟳12(1)—Evidence of acquiescence held admissible on question of whether usage was part of contract.

On the question of whether the parties to a sale of coal intended to contract subject to a usage in the trade to apportion coal pro rata among

⊙⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

buyers, when sufficient cars could not be obtained, evidence that the buyer had acted as if in acquiescence to the custom was admissible, as showing the practical interpretation of the contract.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Pittsvein Coal Company against Benjamin Nicoll, doing business as B. Nicoll & Co. Judgment for plaintiff, and defendant brings error. Affirmed.

Plaintiff below (herein called Pittsvein Company) mines and sells coal. The defendant Nicoll is a wholesale dealer in that commodity.

On November 30, 1915, Nicoll wrot to Pittsvein Company:

"This will confirm telephonic conversation of this morning in which we have bought from you and you have sold to us 50,000 gross tons of your Pittsvein Fairmount gas coal * * * to be shipped in equal monthly instalments during twelve months beginning December 30, 1916. * * * We await your letter confirming this sale."

On the following day Pittsvein Company answered, agreeing (so far as is material to this case) to the above bargain.

Both of these letters were on the business letter paper of the respective parties, and Nicoll's paper contained the following, printed at the head thereof:

"All agreements are contingent upon strikes, accidents, delays of carriers and other causes beyond our control. Monthly settlements by actual railroad weights by scales nearest loading point."

The Pittsvein paper was headed by the following notice printed in red ink:

"Quotations subject to change without notice. All orders and contracts subject to car supply, strikes, accidents and causes beyond our control. Railroad initial weights the basis of all settlements."

A literal compliance with the written portion of the above paper writings would have meant the delivery to Nicoll of 4,166 tons of coal per month; but down to and including August, 1916, that amount of coal was never delivered in any month, but for what Nicoll did receive he paid.

During September-November, 1916, Pittsvein Company delivered to Nicoll, all told, no more than about 8,400 tons, and for somewhat more than one-half of that amount Nicoll refused to pay at all. Whereupon Pittsvein Company brought this action to recover the contract price of said coal so delivered and unpaid for.

The complaint states the matter as two causes of action: (1) Declaring simply as for goods sold and delivered; and (2) setting forth the delivery of the same coal at an agreed price and averring:

"That in the business or trade of mining and selling coal there is an established custom that all contracts or agreements for the sale or delivery of coal are subject to the contingency that the owner or operator of the mine or the seller upon the exercise of reasonable diligence can obtain sufficient railroad cars for the shipment of the full amount of the coal which he has contracted to deliver and that if sufficient cars cannot be obtained the coal shipped shall be apportioned pro rata among the holders of contracts with the owner or operator of the mine or the seller for delivery of coal so that each shall obtain a just and fair pro rata share of the coal shipped; that the said contract or agreement between the plaintiff and the defendant was intended by the parties to be and was subject to the said custom of the trade; that the said contract or agreement expressly provided that it was subject to car supply, delays of carriers and to causes beyond the control of the parties thereto."

The second cause of action then further alleges performance of all conditions by Pittsvein Company except that during September-November, 1916:

"It became and was impossible for the plaintiff to secure sufficient railroad cars to ship the full amount of coal which the plaintiff had contracted to deliver. That at all such times the plaintiff made every reasonable effort to

secure an adequate supply of cars, but during such period was unable to obtain an adequate supply of cars, and the plaintiff, in accordance with the said established custom of the business, apportioned the coal, shipped in the cars actually obtained, among the defendant and other holders of contracts for the plaintiff's coal, so that each should and did obtain his just and fair pro rata share of the coal which the plaintiff was able to ship from its mine."

The above-quoted allegations of the existence of a custom and of fair compliance therewith, Nicoll in his answer specifically denied and served a counterclaim demanding, in substance, damages for the failure of Pittsvein Company to ship his full monthly quota of 4,106 tons during the period September-November, 1916.

Pittsvein Company by its reply defended against the counterclaim by reason of the custom aforesaid, which it pleaded in the same manner as in its complaint. At trial there was no contention as to the amount or times of shipment, quantity delivered, or price.

The trial judge substantially sent to the jury as the sole contentious matter for their determination (in his own language), "What was really understood and entered upon between the parties as their contract?" To assist the jurors in answering this question the court in effect recommended them to consider the notices or headings printed at the top of the letters, confessedly constituting the written contract or the written portion thereof; it also admitted evidence tending to show the practical construction of this contract during the months prior to September, 1916, to the effect that Nicoll had during that period acted as if in acquiescence to the custom of delivering to customers only so much coal as was their monthly quota of the amount for which the miner could procure carriage; finally the court admitted direct evidence from the trade of the existence of the general custom as above pleaded by the plaintiff.

Nicoll (as the court instructed the jury), contending "that the written part only of the letters constituted entirely and wholly the contract between them," duly objected, and excepted to the admission of the foregoing evidence, and all of it.

The jury rendered a general verdict for the full amount claimed by the plaintiff, and to judgment accordingly defendant below took this writ.

Truesdale & Nicoll, of New York City (Courtlandt Nicoll, of New York City, of counsel), for plaintiff in error.

Allan McCulloh, of New York City (Clifton P. Williamson and James A. Stevenson, Jr., both of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). We are presented with 82 assignments of error, a number exceeding in uselessness any yet observed in a civil cause. Both in quality and quantity they are open to the criticisms of Fitter v. United States, 258 Fed. at page 569, 169 C. C. A. 507. We shall notice only such as have been referred to in briefs, and not all of them.

This case presents with an interesting fullness some parts of the large question as to how far and in what manner a written document commonly called a contract, entered into between persons engaged in substantially the same business, couched in simple English words, and relating to matters easy of comprehension by men far removed from the actors in the transaction, can or may be affected by words not written in the contract, or acts not described therein.

[1, 2] Some matters, judicially discussed in reported decisions, may

be laid aside, as either not material or concluded by verdict. There was nothing indistinct or hidden about the notices printed on the business paper of the parties; they were as plain and obvious to the eye as any script or typewriting on the sheet. The custom, or rather usage, exists, and plaintiff below lived up to it honestly and fairly; and in its nature it complies with the requirements of reasonableness, legality, etc., recently again enumerated in Eames v. Claflin, 239 Fed. 631, 152 C. C. A. 465; indeed its legality has before now been recognized, when stated in the body of a contract writing (McKeefrey v. Connellsville, etc., Co., 56 Fed. 212, 5 C. C. A. 482; Luhrig v. Jones, 141 Fed. 617, 72 C. C. A. 311). It may be added that defendant below knew of the custom asserted, though he heartily disapproved of it—at least when sought to be enforced against him on a rising market—but this is immaterial. Silverstein v. Michau, 221 Fed. 55, 137 C. C. A. 79; Neer v. Lang, 252 Fed. 575, 164 C. C. A. 491.

[3, 4] The distinction (usually disregarded) between usage and custom may be noted; what this pleading calls an "established custom" is really a trade usage (Williston, Contracts, § 648). As has often been said, a lawful custom is itself part of the common law, while a lawful usage, proved and shown to affect both parties, may be described as the law of their case.

Thus is reached the only point at bar: Was it lawful to permit the jury to find, in effect, that Nicoll's contract was not to get 4,166 tons of coal per month, but to get so much thereof as the pleaded usage allowed him, and to reach that conclusion after considering not only the evidence of usage, but the notices on the contract letters and Nicoll's acts (including letters) during the earlier months of the contract year? Plaintiff in error urges, in substance, that no one of these elements of defense was in itself lawful, and that conjointly they no more make a defense (to his counterclaim) than does the addition of zeros produce a finite quantity. The argument is fair, but it cannot be denied that if any one of the elements noted be admissible, the others are, or at least may be, regarded as legitimate corroboration. Interpretation of contracts is always said to be an endeavor to discover and enforce what the parties meant, but the rules produced by accumulated decisions as to how such discovery shall be conducted often overlap and sometimes produce hindrance rather than help, while reconciliation of all cases is a task neither possible nor worth the effort; and it is notable that the most helpful and authoritative modern writers on matters cognate to the question at bar (Messrs. Wigmore and Williston) do not attempt it.

[5, 6] Taking up the plea of usage, and considering it alone, we have to deal with the trade custom variant of the parol evidence rule. With Dean Wigmore (Evid. § 2465) we think that there is no reason in the nature of things why the individual parties to a transaction may not employ words or whole phrases in a particular sense irrespective of the ordinary sense. Indeed when tradesmen say or write anything, they are perhaps without present thought on the subject, writing on top of a mass of habits or usages which they take as matter of course. So (with Prof. Williston) we think that any one contracting with

knowledge of a usage will naturally say nothing about the matter unless desirous of excluding its operation; if he does wish to exclude, he will say so in express terms. Williston, Contracts, § 653. Courts for a long time have rightly been influenced by this belief, until a survey of decisions leads the same learned author to conclude, as we do, that usage has been more potent than any other collateral parol matter to affect, if not control, contractual interpretation. Section 654. In sound theory there is in each case only a question of fact, viz.: Were the parties using words in a special mutual sense? Rules are very apt to be stated dogmatically, and when torn from their environment of facts, apparently to swear at each other. Thus Hostetter v. Park, 137 U. S. at page 40, 11 Sup. Ct. at page 4, 34 L. Ed. 568, declares "it is well settled that parties who contract on a subject-matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary," and De Witt v. Berry, 134 U. S. at page 312, 10 Sup. Ct. at page 537, 33 L. Ed. 896, asserts:

"The principle is that, while parol evidence [of custom or usage] is sometimes admissible to explain such terms in the contract as are doubtful, it is not admissible to contradict what is plain, or to add new terms."

Such rules can be understood only from the context of facts, which are rarely quoted. Cf. Vanderbilt v. Ocean, etc., Co., 215 Fed. 886, 132 C. C. A. 226.

The most frequent regulatory statement is to say that in commercial transactions, incidents may be annexed to the written agreement by usage or custom (Williston, Contracts, § 652); but no man can confidently assert beforehand exactly what incident may be annexed, nor how deep it may cut into the meaning of words, as they would be read by an intelligent stranger.

We conclude (again with Prof. Williston) that the most philosophical statement or explanation of the rule is that of Lord Campbell in Humfrey v. Dale, 7 E. & B. 266, who said, in substance, that the moment usage does more than verbally define or explain the words used, it does in a certain sense vary the contract; the truth is that in trade agreements the parties oftentimes do not set down on paper the whole of their contract in all its terms; they set down only those necessary to be determined in the particular case by specific agreement, leaving to implication those general and unvarying incidents which a uniform usage would annex. The facts in the case whose words we have paraphrased are most instructive; for there brokers had sold goods specifically "to our principals," and were by usage held to personal responsibility on the "bought note" because they had not disclosed their principal's name.

[7] Further, however, the matter in which this contract is affected by usage is one of number, quantity, amount, or measurement, and on this point, while it is quite impossible to harmonize all decisions (see citations 27 Rul. Cas. Law, 188) there is no doubt at all that ambiguity in phrase is not necessary to let in evidence of usage (Walls v. Bailey, 49 N. Y. 464, 10 Am. Rep. 407; Smith v. Wilson, 3 B. & Ad. 728, and for other cases, Williston, Contracts, § 608, note).

[8, 9] Whether without the printed notices on letter heads, and the practical interpretation of the earlier contractual period, the plea and evidence of custom would have been enough to take the case to the jury, we are not required to decide. The usage annexed an incident of a nature which materially changed the possible, and as it turned out the actual, content of the agreement. Yet assuredly no more so than in Humfrey v. Dale, and Walls v. Bailey, supra, or in Lillard v. Kentucky, etc., Co., 134 Fed. 168, 67 C. C. A. 74, an opinion by Justice Lurton when Circuit Judge.

Taking up next the effect of printed notices, this court must recognize the saying of Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093, that "a printed billhead can have little or no influence in changing the clear and explicit language of the letters" constituting or evidencing a contract. But the citation is far from declaring that such notices cannot as matter of law have any influence over decision. How great that influence ought to be will depend on the facts of each case, and we think the rule (so far as such matters can be reduced to theorems) is well put in Sturtevant Co. v. Fireproof, etc., Co., 216 N. Y. 199, 110 N. E. 440, L. R. A. 1916D, 1069, viz. it "cannot be held, as matter of law, that [such notice] was incorporated in and made a part of" the proposal, acceptance or contract. But Pittsvein Company never rested on the notices; its plea in substance was that the usage was so incorporated, and the notice in effect called attention thereto. On this record we cannot dissociate the notice from the usage; whether without any such support the notice would have been enough to get to the jury is a query beyond the exigency of this case, but one on which Poel v. Brunswick, etc., Co., 216 N. Y. 310, 110 N. E. 619, and Ohio, etc., Co. v. Clarkson Co. (C. C. A.) 266 Fed. at page 189, are instructive.

Such notices, however, must mean something, no court can erase them altogether and when such obvious and close connection exists between the notice words "all contracts subject to car supply," or "all contracts contingent upon delays of carriers," and the proven usage, we may and do hold that it was for the jury to say, not that the notice became incorporated in the contract, but the usage was intended by the parties so to be incorporated, and the notices used by both parties were some evidence of such intent.

In so far as Menz v. McNeeley, etc., Co., 58 Wash. 225, 108 Pac. 621, 28 L. R. A. (N. S.) 1007 (much relied on by plaintiff in error) is inconsistent with the foregoing, we differ, preferring the authority of the cases cited above, some of which recognize the doctrine of that decision partially only.

[10] The remaining point seems to us clear, for assuming now that the jury question was whether the parties intended to contract subject to the usage, it was plainly competent and material to show such intent in what Nicoll wrote, by showing what Nicoll did; this is, or may be, that "practical interpretation," which is "always a consideration of great weight." Insurance Co. v. Dutcher, 95 U. S. at page 273, 24 L. Ed. 410.

When it was established that there was a contract running over a

year and an applicable usage, to which the notices might reasonably refer, and that for the earlier months of the year both parties conformed to the usage, the jury did not doubt, and we do not doubt, that the question put to them was in accord with the better doctrine of contractual interpretation.

Judgment affirmed with costs.