BANK OF THE UNITED STATES, (FINDLAY'S EX'RS v.)   See Case No. 4,791.

BANK OF THE UNITED STATES, (GEORGETOWN v.)   See Case No. 5,343.

## Case No. 917.

### BANK OF THE UNITED STATES v. GODDARD.

[5 Mason, 366.] [1]

Circuit Court, D. Massachusetts.   Oct. Term, 1829.

NEGOTIABLE INSTRUMENTS — NOTICE OF NON-PAYMENT — NOTICE FROM ONE INDORSER TO ANOTHER.

1. Where a note is made payable at a particular place, and the indorser resides there; if the holder remits it to his agent at such place for payment, and it is dishonoured; the agent is not bound to give notice of the dishonour to the indorser; but his duty is to give notice to his principal; who may then give notice to the indorser, and if given in due time after the principal has received notice, the indorser is bound.

[Followed in Codrington v. Adams, Case No. 2,937.]

2. If due notice is given by a holder to his immediate indorser, of the dishonour of a note, and the latter gives due notice to a prior indorser, the holder may recover against the latter, although he has never given him any notice; for due notice given by any party on the bill, is notice to charge in favour of all subsequent parties.

[3. The relation of a branch of the Bank of the United States to another branch, or to the parent bank, which has forwarded paper for collection, is simply that of principal and agent.]

At law. Assumpsit by the plaintiffs [the president, directors, and company of the Bank of the United States] as indorsers of a note, signed by one J. K. Pickering, and indorsed by the defendant [Samuel Goddard] dated at Portsmouth (N. H.), on the 1st of January, 1829, for the sum of 1.005 dollars, payable to the defendant or order, at the United States Branch Bank in Boston, in sixty days and grace. Plea, the general issue. [Verdict and judgment for plaintiffs.]

At the trial the material facts were as follows: In the winter of 1828–9, John K. Pickering, of Portsmouth, being deeply insolvent, owed the United States Branch Bank at Portsmouth a certain amount, for which they agreed to accept his note for $1,000, endorsed by the defendant. A note, of which the following is a copy, was accordingly given to the bank. "Portsmouth, Jan. 1st, 1829. Value received, I promise to pay Samuel Goddard or order, one thousand dollars, at the United States Branch Bank in Boston, in

---

[1] [Reported by William P. Mason, Esq.]

sixty days and grace." Endorsed, "Samuel Goddard." Mr. Wentworth, the cashier of the Portsmouth Branch, enclosed this note to Mr. Frothingham, the cashier of the Boston Branch, in a letter dated March 2nd, in which he says, "I enclose for collection J. K. Pickering's note for $1.000. P. S. I have notified J. K. Pickering here, of his note being at your bank." He afterwards, at the request of Pickering, wrote another letter to the cashier of the Boston Branch, under date of March 3d, which was received the 4th, in which he says, "I'll thank you to inform Mr. Samuel Goddard that J. K. Pickering's note is at your office, as I think he will pay it without protest." It also appeared from the evidence, that Pickering's insolvency was known to Goddard when the note was endorsed; that Pickering never expected to pay it, and that the note was made payable in Boston, where Goddard resided, for that reason. Pickering, about the time of making the note, put into Goddard's hands funds, which Pickering thought sufficient to pay this note and some other liabilities; but from the depreciation of property, and other causes, these funds proved to be wholly insufficient. Goddard had done business in Boston, without having a counting-room, during the last two or three years, though he resided principally in Brookline; but in November, 1828, he took a house in Boston, which, with his family, he has since occupied. It was shown, that William Stevenson, a notary public, who noted the protest on the note in the case, had also presented to Goddard, in February last, a draft or bill, directed to "Samuel Goddard, Merchant, Boston." It was also shown, on the part of the plaintiffs, that Goddard's name was not in the directory, and that his residence was not in fact known to the officers of the Branch Bank in Boston, but might have been ascertained by reasonable inquiry. And on the part of the defendant it was shown, that Nathaniel Goddard, Esq., a merchant in Boston, who was in the habit of doing business at the Branch Bank, was the uncle of the defendant. The note was not paid at maturity, and the question in the case was, as to the sufficiency of the notice of nonpayment to the defendant. The facts in regard to this question were these. On the 5th of March, the grace on the note expired. On the afternoon of the same day the protest and notices were put into the mail, which closed at Boston that evening, and should have arrived at Portsmouth the next morning. But owing to a severe snow-storm, the mail from Boston did not arrive at Portsmouth until late in the afternoon, and some hours after the mail had gone from Portsmouth to Boston. On the next day, that is, the 6th of March, Wentworth wrote to the defendant a letter, which was put into and sent by the mail of the same day, and which he received on the 8th, stating the non-payment of the note, and requesting him to pay it. No inquiry was made for the defendant by the officers of the Branch Bank at Boston, for the purpose of giving him notice of the nonpayment of the note. And no notice was in fact given, except as above mentioned.

Theophilus Parsons, for defendant.

Injury to the defendant is to be presumed from laches on the part of those, who should notify him. The endorser is entitled to notice, although perfectly conusant of the insolvency of the maker, and although he puts his name on the paper merely to give it a credit. Smith v. Becket, 13 East, 187. This case is confirmed and the principle established in its full extent, in Brown v. Maffey, 15 East, 216. The cases, which show this principle to be adopted in this country, are very numerous. There is a very full collection of them in a note to the 211th page of the last American edition of Chitty, on Bills. If the endorser has taken all the property and assets of the maker, or if he has received full indemnity for his indorsement, he loses his right to notice. But though he has at any time effects in his hands as indemnity, if they are afterwards withdrawn or disposed of, he has full right to claim notice; and this is our case. See Chitty, 206, and Clegg v. Cotton, 3 Bos. & P. 239. The defendant, then, being entitled to notice, the question comes up, whether the notice in the present case was sufficient. The law is now settled, that the holder of a note may have all of the day succeeding its dishonour, wherein to notify the endorser; but he can have no more. In this case the notice was insufficient, unless the agent or banker may always send his notices back to the holder, from whom they may go to the endorser. But this principle cannot possibly be adopted without qualification. It cannot be supposed, that a banker may always send notice of non-payment to the holder, however near to him the endorser may reside, however well he may know the domicil of the endorser, and however far from them the holder may live. No case whatever can be found to justify such a principle. The cases relied on by the plaintiffs go upon very different grounds. In the case in 5 Mass. 167, the court say, the agent of the holder is justified in sending him the notices, because "he may not have known the domicil of the defendant." In 3 Pick. 180, (Eagle Bank v. Chapin,) the court say, the notary did "the best thing for the defendant he could do." In the leading English cases, as in 9 East, 347, the agent and the plaintiff, who was principal, lived in London, and the endorser at a distance. Here the case is just the reverse. It is now perfectly well settled, that a question of this kind is a question of law; that the court must take into consideration all the facts, and determine, whether, on the whole, reasonable diligence was used in informing the endorser of non-payment. Here, it is not enough to say, that the Boston Branch Bank must have learnt at once, by the slightest inquiry, the residence of the

defendant. The case goes much farther. The cashier of the Boston Branch was actually informed of it. Mr. Wentworth, living in Portsmouth, says to Mr. Frothingham, living in Boston, on the 2d of March, "I have informed Mr. Pickering here, that the note is with you," and on the 3d of March, "I will thank you to inform Mr. Goddard." Mr. Wentworth would have added nothing to the plain and unavoidable meaning of the letters, had he said, "I have notified Mr. Pickering here, because he lives here, and will thank you to inform Mr. Goddard, because he lives in Boston." Mr. Frothingham, then, was informed, that Mr. Goddard lived in Boston, and that the note was sent to him in Boston to be there paid by Mr. Goddard; and certainly, he cannot be justified by any reported case, or by any reason or principle, in sending the notices of non-payment, under these circumstances, to Portsmouth, that they might come back again to Boston.

Webster in reply.

The different branches of the Bank of the United States, have no connexion with each other; but treat each other as different institutions. The note was sent for collection. It was not the fund of the general parent bank, but of the Portsmouth Branch, and constituted part of specific funds of the latter. There was no request by Wentworth, in his letter to the cashier at Boston, to give notice of the dishonour of the bill to the defendant, after it was dishonoured; but only antecedently to its becoming due. Nor does it appear, by the letter containing the request, whether the notice was to be given to the defendant as indorser, or as having funds of Pickering in his hands. If the cashier at Boston had been requested to give notice of the dishonour, and his residence was pointed out, still the plaintiffs are entitled to recover. It is no part of the contract with the indorser, that he shall receive notice of the dishonour, at the place, where the note is made payable, or from the holder or his agent there. It is res inter alios acta. The agent is in no case bound to give notice to the indorser. He may contract so to do; and if he then neglects, he may be responsible to his principal; but the indorser has no rights from such a contract. The practice, in all cases of this sort, is, for the bank to return the note protested to the holder, and not to give notice to the indorser. (This was admitted on the other side.) If the indorser receives notice from the holder within the time required by law, he has no right to say, that an agent might have given earlier notice. The note here was returned according to the course of business; and it is admitted that the notice was in due time, if the agent was not bound to give notice.

The cases in Bayley, Bills, 173, 5 Mass. 167, and 2 Johns. Cas. 1, are in point. The cases, too, of the bankers in 3 Bos. & P.

599, 9 East, 347, and 15 East. 291, are decisive in our favour. The principle is quite as strong, where the agent, and holder, and indorser live in the same place, as if they live in different places.

STORY, Circuit Justice. I lay out of the case all consideration of the fact, that the note belonged to the Branch Bank at Portsmouth, and was remitted to the Branch Bank at Boston for collection, both these branches being but the agents of the Bank of the United States, the real holder of the note. In the first place, it is admitted, that the known course of business in each of the branches is, in respect to all notes transmitted from another branch, to deal with them in the same manner as if transmitted by a stranger bank, and to return their notes back, upon their dishonour, to the branch, from which they have been received. In the next place, the branches being established by the parent bank for its own particular purposes, their agency may be limited and controlled according to the pleasure of the parent bank. So that the present case does not at all differ from that of a private principal, who employs different agents in different cities to transact business, or negotiate, and discount, and collect, notes there upon his account. No distinction was pointed out at the argument, as growing out of this circumstance, differing the case from the common case of holder and agent, or holder and banker; and none is believed to exist. The case may, therefore, for all the purposes of this suit, be considered as if the Portsmouth Branch were the real holder of the note, and wholly unconnected with the Branch in Boston, and employing the latter as its agent to collect the note when due. The question, then, is, whether notice of the dishonour ought to have been given by the Branch Bank at Boston to the defendant, or whether the notice sent by the Branch Bank at Portsmouth to the defendant was in due time, and sufficient in point of law. It is admitted, that there is no objection to the notice on the account of the delay of its arrival to the defendant until the 8th of March, when it ought regularly to have arrived on the 7th. The snow-storm sufficiently accounts for that; and the notice was given as early by the holder as, under the circumstances, it could or ought to be.

The case is narrowed down, then, to the consideration, whether by law the defendant was entitled to notice directly from the agent in Boston, which, by due inquiry and diligence, he might have given on the 6th of March; or whether a circuitous notice through the holder was sufficient. The argument of the defendant's counsel is this. The agent is bound to give notice of the dishonour, to a prior indorser, who is intend-

ed to be charged, if his residence is known to him, or if, upon reasonable inquiry, it can be ascertained, and it is in fact nearer to his own, than that of the indorser, and a notice will thereby reach him earlier than from the principal holder. Reasonable diligence is in all cases sufficient in giving notice; but what is such must be judged of by all the circumstances of each case. If the agent may in all cases omit to give notice to the indorser, then, although he resides in the same city with the indorser, and the principal holder resides at a great distance, the indorser would be held, although a circuitous notice from the holder might not reach him for a week or a month, which would be unreasonable. And it is said, that there is no case, which justifies such a doctrine. If there be no such case, then the question must be considered upon principle. Now it is very clear, that if the Boston Branch had been the holders of the note, they would, under the circumstances, have been entitled to recover against the defendant, since he received due notice from the prior holders, to whom due notice was sent by them, and to whom, upon payment of the note, the defendant would have been answerable over. It is laid down in Bayley, Bills, (4th Ed.) 163. and better authority can scarcely be, that "though a holder or any other party gives no notice but to the person, of whom he took the bill; yet if notice is communicated without laches to the prior parties, he may avail himself of such communication, and sue any of such prior parties. It is no objection, in such case, that there was no notice immediately from the plaintiff to the defendant." And this doctrine is fully supported by decided cases. Jameson v. Swinton, 2 Camp. 373; Wilson v. Swabey, 1 Starkie, 34; Stanton v. Blossom, 14 Mass. 116; and Stafford v. Yates, 18 Johns. 327,—are in point. The reason seems to be, that as the notice is sufficient to charge the defendant with the payment in favour of the person who gives it, it ought to charge him in favour of all subsequent parties, because he sustains no injury from want of notice. It is, as to him, due notice. If, then, as holders, they might affect the defendant with responsibility by such circuity of notice, what is the reason, why, as agents, they may not give their principal the same right? If there be any, it must be upon the ground, that the agent is in all cases bound to give direct notice to the indorser intended to be charged, in the same way. and within the same time, and in the same manner, as his principal ought, if there were no agency, and the bill remained in his hands. Such a proposition has never yet been maintained, as far as I know, by any court of justice. And in the argument it was admitted, that if the domicil of the party, to whom notice is to be given, be unknown to the agent, he is not bound to give any notice. And it has been decided, that when a holder transmits a note for payment to his agent, he is not bound to inform the latter where the prior parties live, so as to enable the agent to give them notice.

But how is it established, that in any case an agent to receive payment of a note is bound to give notice to any person, but his principal, of the dishonour? The nature of the transaction does not necessarily imply it. The authority to receive payment may be complete, without any incidental authority to give such notice. It is certainly competent for the holder to authorize his agent to do no more than to demand payment, and give him notice of the dishonour. If the agent actually gives notice in due time to the antecedent parties, that may be good in favour of his principal. If the latter requires his agent to give such notice, and he neglects to do it, he may be chargeable with any loss sustained by such neglect. But the question is not, what the agent may do, or ought to do, as between himself and his principal; but whether the other parties, to be charged upon notice, have any right to such notice from him, so as to be discharged by his neglect. As I understand the doctrine of law upon this subject, it is, that an agent, upon the dishonour of a note remitted to him to procure payment, is bound to give notice of the dishonour to his principal, and transmit to him the proper evidence of it; but he is not bound to give any notice to other parties on the note. That was manifestly the doctrine of the court in Haynes v. Birks, 3 Bos. & P. 599, 601, where a bill had been remitted to bankers, as agents of the holder, to procure payment; and the argument there was, that in such a case the bankers, being agents of the holder, the defendant (the indorser) was entitled to the same notice, as if the bill had remained in the plaintiff's hands. But the court overruled the objection; and said that it was the banker's business only to acquaint his principal of the dishonour. The same doctrine was held in Tunno v. Lague, 2 Johns. Cas. 1. That case is very strong, for the defendant, who was sought to be charged, lived in the city of New-York, the bill being drawn by him at Jeremie (N. J.) in favour of the plaintiffs, upon a house in New-York, and dishonoured by the latter. The notice was not sufficient in the opinion of the court, having been given at New-York, long after the dishonour, if the party giving the notice had been the holder; but being an agent only, it was held, that the notice was sufficient, because it was earlier than the defendant would have had it, if the bill had been sent back to the plaintiffs, and notice had been sent directly by them. And the court said, that the duty of the agent extended no farther than to give notice to his principal. The same doctrine is also asserted in Colt v. Noble, 5 Mass. 167. The bill was drawn in New South Wales, in favour of the defendant, and by him indorsed at Madras to the plaintiffs, who sent it to their agent in London, where

it was dishonoured by the drawees. The defendant resided in Portsmouth, N. H. and the agent might have sent notice to the defendant at Portsmouth in three months; but he merely transmitted the bill and protests to his principal at Madras, who sent notice from thence to the defendant, who did not receive it until more than a year after the dishonour. The court held the notice sufficient. And Mr. Chief Justice Parsons, in delivering the opinion of the court, said, "A person appointed a factor to cause a bill to be presented is entrusted with no other powers, and it is his duty to notify his principal." It is true, that in that case it did not appear, that the agent knew the defendant's domicil; but that consideration was not relied on. And the court decided generally, that the holder was not bound to give information of the domicil of the indorser to his agent; nor was the latter bound to give notice to the indorser of the dishonour; and that it made no difference, whether the bill was remitted to the factor to procure acceptance, or in payment of a debt due to him. The case would seem, therefore, to travel on all-fours with the present.

It appears to me, also, that the cases, in which it has been holden, that a banker, who as agent receives the bill of a customer, is only bound to give notice of its dishonour to his customer, in like manner as if he were himself the holder, and his customer were the party next entitled to notice, confirm the doctrine. The legal effect of these cases is, that the customer has the like time to communicate such notice. as if he had received it from a holder; and therefore by placing a bill or note in the hands of a banker, the number of persons, from whom notice must pass, is increased by one. So it is laid down in Bayley, Bills, (4th Ed.) 173, and the cases of Haynes v. Birks, 3 Bos. & P. 599; Scott v. Lifford, 9 East, 347; and Langdale v. Trimmer, 15 East, 291,—fully support the position; and it has also been recognized in the recent case of Firth v. Thrush, 8 Barn. & C. 387. In all these cases, the bankers were agents; and if they were bound to give notice at all, they might have given it a day earlier than it was received from their principals. But the court treated the cases exactly as if the agents were holders, and necessarily repudiated the notion, that either as holders or as agents, they were bound to give notice to any other person than their principal. But it is said, that in neither of these cases did it appear, that the bankers knew the residence of the parties, to be charged by notice; or that the banker's residence was nearer to 'the parties, than that of the principals. If that be admitted, it is still a sufficient answer, that neither of these facts was treated as material; and the judgment of the court proceeded upon a principle, which comprehended all such cases. If the sufficiency of the notice depended upon the fact, whether the agent had no knowledge of the residence of the parties, or lived farther from them than his principal, that fact ought to have come from the plaintiff as part of his case; for the onus was upon him to show due notice. I am not satisfied, however, that the case in 3 Bos. & P. 599, was not a case, where the banker lived nearer to the indorser than to the holder. The latter lived at Knightsbridge, and both of the former lived in London. But it seems to me, that there is a far stronger reason for requiring that the banker should give notice, where he and the principal live in the same town, or at least that notice in such cases should be given as early, as the principal might give it, if the note were in his own hands, than where the principal resides in a different town, since the communication between them is so much more easy.

It appears to me, that the question now before the court has been closed by authorities; if not by direct adjudication, at least by necessary inference. The doctrine is laid down, without any exception, that the agent is not bound to give notice; and if any exception had existed, it could not for so long a period have been overlooked. But if it were otherwise, and there were no authority in point, my own judgment would be the same. It appears to me, that an agent is not bound to give notice to the indorser of the dishonour of any note; and that his agency does not naturally include such a duty. If he contracts with his principal to give such notice, that is a mere private contract between the parties, with which the indorser has nothing to do. It neither enlarges, nor limits his rights. It may be inconvenient for him to receive a circuitous notice; but that is not sufficient to change the law. I think it would be far more inconvenient to establish the doctrine now contended for in the defence. All that is required by law, is, that the holder should give notice to the indorser in a reasonable time after he has knowledge of the dishonour. and that there should be no laches in getting that knowledge, if an agent has been employed.

This view of the case renders it unnecessary to consider the point, whether, under all the circumstances, the defendant was entitled to notice, he having received security, originally supposed to be sufficient to meet the payment; as well as some other points suggested in the argument at the bar. Judgment must therefore be entered for the plaintiffs, according to the verdict. Judgment accordingly.