**PAN–AMERICAN BANK & TRUST CO. et al. v. NATIONAL CITY BANK OF NEW YORK.***

(Circuit Court of Appeals, Second Circuit. February 9, 1925.)

No. 119.

**1. Contracts ⚖191—Name given by parties to their contract does not determine its legal effect.**

The legal effect of what men do is not determined by the names they affix to their deeds, but the essential nature of their acts determines, and the law has its own names for the results they achieve.

*Certiorari denied 46 S. Ct. 18, 69 L. Ed. —.

**2. Guaranty ⚖4—Agreement by one bank to reimburse another for the amount paid out on a letter of credit issued on request of promisor held not a "guaranty."**

A contract between two banks, made by correspondence, *held* not one of guaranty, though that term was used, but an agreement by one to reimburse the other for the amount paid out on a letter of credit issued at the promisor's request.

**3. Banks and banking ⚖191—Bank which procured issuance of letter of credit by another held bound to reimburse the latter for the amount paid out thereon.**

Where defendant bank, wishing to issue a letter of credit to a customer, available to a shipper in Brazil, but, being unknown there, procured its issuance by plaintiff bank, which had a branch in Brazil, it was bound to reimburse plaintiff for the amount paid out thereon, which amount was recoverable in assumpsit.

**4. Banks and banking ⚖191—Agreement to reimburse another bank for amount paid out on a letter of credit issued at its request held not ultra vires.**

Such transaction was in legal effect the issuance of the letter of credit by defendant itself, which was clearly within its powers, and its agreement to reimburse plaintiff was not ultra vires.

**5. Bills and notes ⚖144—"Negotiation" of instrument defined.**

An instrument is "negotiated," when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Negotiation.]

**6. Banks and banking ⚖232 — In business transactions between a national bank and its foreign branch, they deal as separate entities.**

A national bank and its foreign branch, organized under Act Dec. 23, 1913, § 25 (Comp. St. § 9745), are separate entities as relates to business transactions between them, and a branch bank, which negotiates a draft drawn against a letter of credit issued by the parent bank becomes the legal holder thereof, and their respective rights in relation thereto are governed by the same rules as between unrelated banks.

**7. Banks and banking ⚖191 — Insurance policies required to be attached to drafts drawn against a letter of credit may be in foreign money.**

The fact that a letter of credit is in dollars does not necessarily require that policies of insurance required to be attached to drafts drawn against it must also be in dollars.

**8. Banks and banking ⚖191 — Conditions of letter of credit; laws and usages of place of use may be followed.**

Where, at the request of defendant bank, plaintiff bank issued a letter of credit against which drafts were to be drawn by a shipper in Brazil, in the absence of any requirement otherwise, it was permissible for plaintiff to accept

documents required to be attached to the drafts which complied with Brazilian law and usage.

**9. Banks and banking ⊜⟿191—Letter of credit held irrevocable without seller's consent.**

Letter of credit, after notice to the person for whose use it was issued, *held* irrevocable without his consent.

Hand, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by the National City Bank of New York against the Pan-American Bank & Trust Company and others. Judgment for plaintiff, and defendants bring error. Affirmed.

Plaintiff below (hereinafter called City Bank) is one of the largest financial institutions in this country, with numerous branch offices, and especially one in the city of Rio de Janeiro. It is and long has been engaged, inter alia, in the business of issuing commercial letters of credit and attending to the collection of the same.

Defendant below (hereinafter called Pan-American) is an institution chartered by the laws of Louisiana, transacting business in New Orleans. At the times in question it had a capital and surplus not exceeding $1,400,000. It had issued commercial and other letters of credit, and we are satisfied that the evidence showed conclusively that this branch of its activities had been, and was when this cause of action arose, in charge of its vice president, one Wuerpel. The story of this case begins May 15, 1920, when Pan-American cabled direct to the Rio branch of City Bank:

"We guarantee payment drafts Hermano Barcellos on W E Seago and Company eight hundred fifteen thousand dollars covering purchase two thousand tons Brazilian granulated sugar twenty two hundred forty pounds each shipment soon as possible not later than September price about eighteen dollars eighteen cents per hundred pounds c. i. f. New Orleans provide you cable us your guarantee for delivery of sugar."

City Bank's representatives in Rio cabled the home office inquiring who the Pan-American was, and stating that this unknown correspondent had "confirmed through us a commercial credit $815,000." The home office replied that Pan-American was in good standing, stated that another cable after consultation with Pan-American would be sent, and advising the branch not to "guarantee delivery of sugar"—something which the branch had already refused to do by cable to New Orleans. Immediately on receiving the above inquiry from Rio the City Bank telegraphed the Pan-American that as the "amount is large we wish you would wire us full particulars."

On May 18th Pan-American replied to this last telegraphic message, stating that negotiations were still pending as the Rio branch was "declining guaranty for delivery." This was followed by a letter from Wuerpel to City Bank, repeating the telegraphic messages, confirming them, and adding that Seago (the person asking for the credit) was "perfectly responsible, we feel perfectly safe in making this guaranty." The guaranty referred to is the proposition made by the cable to Rio of May 15th, supra.

On the day following, May 19th, Pan-American again cabled the Rio branch, referring to its message of May 15th, and stating: "Our guaranty remains good, provided shipper's order bill of lading properly indorsed and certificate insurance attached to drafts." This is the first mention of any documents to be produced as a condition precedent to paying drafts. This exchange of requests and explanations amounted to nothing, no agreement was reached, and it is evident that the home office of the City Bank perceived that nothing could be done by a series of long distance talks between strangers, and it therefore telegraphed to Pan-American, on May 24th, as follows: "Refer recent interchange telegrams in view of probable difficulty negotiating your bills in Rio eight hundred thousand dollars where you are not so well known we suggest you open confirmed sight credit through us here cash against documents in New York our rate one eighth of one per cent."

On the following day, May 25th, Pan-American replied to City Bank by wire thus: "Refer your telegram yesterday credit your Janeiro branch we have cable from them today please cable them confirming sight credit favor Barcellos account Seago as originally advised without requiring their guaranty of delivery, provided, shipping documents properly indorsed are attached to drafts payable your New York office stop instruct them to advise Barcellos that all is arranged stop your commission satisfactory."

At the same time Vice President Wuerpel wrote City Bank, repeating and confirming the telegrams and concluding: "As we now understand the matter we have opened for account of Seago & Co. a credit through you, with your Rio Janeiro branch, in favor of Hermano Barcellos for about eight hundred and fifteen thousand ($815,000) dollars, cov-

ering their purchase from Hermano Barcellos of about two thousand (2,000) tons Brazilian granulated sugar two thousand two hundred forty (2,240) pounds each, shipment soon as possible not later than September, at 18.18 per hundred pounds c. i. f. New Orleans subject to Brazilian government granting export license to shippers, provided that documents covering the shipment are properly indorsed and presented either to you in New York or to us here for payment. We have requested you in our telegram to have your Rio Janeiro branch to advise Hermano Barcellos of this credit and sincerely hope that everything now is in proper order."

On the same May 25th, Pan-American cabled Rio that it had requested "your New York office to confirm credit without your guarantee for delivery." Thus by May 26th the matter was in substance concluded and affairs set in motion, for on that day City Bank cabled the Rio branch as follows: "Referring to your telegram 870 negotiate sight drafts up to $815,000 dollars U. S. Cy. on the National City Bank of New York, New York, drawn by Hermano Barcellos account of Seago Co. when accompanied by invoice consular invoice insurance certificate including war risk full set bills of lading to order of the National City Bank of New York, New York, covering 2,000 tons Brazilian sugar at about $18.18 per 100 pounds c. i. f. to New Orleans, credit in force for until September 30th notify beneficiaries promptly. Credit number is 17504 bill of lading order blank indorsed. Send one set documents to Whitney Central National Bank, New Orleans, on steamer carrying goods if possible. Confirm this credit to the beneficiaries."

And on May 27th followed it up by writing a letter to Pan-American thus: "In accordance with your favor of May 19, and interchange of telegrams, we established by cable through the medium of our Rio de Janeiro branch for account of Seago & Co., New Orleans, La., our confirmed commercial letter of credit No. 17504, for $815,000.00 (eight hundred fifteen thousand dollars) United States currency, in favor of Hermanos Barcellos, as per inclosed application and agreement, both of which kindly return to us duly signed by your clients and your good selves as guarantors. Kindly note that, as your letter stated 'insurance certificates,' we have made this credit available against marine and war risk insurance certificates, which kindly confirm."

The "application and agreement" referred to in this last letter consisted of:

(1) A request, addressed to the City Bank, to establish a "confirmed documentary letter of credit under our guaranty" on specified terms and conditions, which had been already substantially communicated to Rio, ut supra.

(2) A copy of the letter of credit itself, which was an authorization to Barcellos to value on City Bank for account of Seago up to "an aggregate amount" of $815,000 by sight draft, when accompanied by bills of lading "for merchandise" invoiced to read two thousand tons Brazilian sugar at about $18.18 per one hundred pounds c. i. f. New Orleans.

(3) A letter, addressed to City Bank, stating that in consideration of the issuance of said "confirmed letter of credit" the signatories agree "to its terms" and bind themselves to "pay the amount of each draft drawn under it." This letter also stated that "neither you nor your correspondents in Rio de Janeiro shall be responsible for any loss arising from any difference in quality or character of merchandise imported under this credit from that stipulated and expressed in the invoice accompanying the drafts, nor for correctness or genuineness of documents, nor for delay or deviation from instructions in regard to shipment, nor for any other cause beyond our control." It concluded with the statement that "this letter of credit can only be revoked with the consent of all parties interested."

These documents were signed, No. 1 by the Pan-American Bank, No. 2 by Seago and the Pan-American Bank, and No. 3 by Seago only. These signatures were plainly irregular. Both No. 1 and No. 3 had printed or stamped at the foot the following: "In consideration of the opening of the above credit we hereby guarantee the faithful performance of this obligation"—and this clause had never been signed by anybody.

Just when the signatures above stated were made we cannot ascertain, and it is not material; but after the documents had been returned to New Orleans, with a specific request for signature of the clause last quoted, the documents were returned to New York on June 10th, in or with a letter by Vice President Wuerpel, stating: "We now return the guarantee in the credit for account of W E Seago & Co. duly signed by ourselves"—although no such signature was ever actually affixed. But of this nothing further was ever said.

Meanwhile the Rio branch, which evidently did not think well of Barcellos, had received additional instructions to go ahead with the business, and that branch on June

5th formally wrote Barcellos in Rio, stating that they had received cable instructions from New York (substantially as per above quoted message) and added: "Please note that in accordance with the above instructions the credit will be in force only when you obtain the required government license for the export of the sugar. For your guidance please note that the polarization certificate must be issued by the Laboratorio Nacional de Analyses and the insurance certificate by a company approved by this bank. In case you are unable to follow the above instructions, please communicate with us before making the shipment of the merchandise, inasmuch as the payment will be made only under the specified conditions."

On the next day Barcellos replied to the Rio branch, agreeing to all the terms and conditions stated and accepting the credit. These documents, written in Rio de Janeiro, were in Portuguese, and, as translated, one portion of Barcellos' letter is as follows: "I understand that for me to avail of said credit I must deliver all of the above-mentioned documents not later than September 30th next, on which day, if export license has not been granted to me, the credit may become without effect. Until that day meanwhile, in conforming with the statements in the telegram copied by you, said credit in question will be considered in force." This closed the transaction so far as Barcellos was concerned.

On the 12th of August following, Pan-American cabled City Bank in New York: "Seago cannot accept now. Cancel credit." To this City Bank replied that the credit had been "confirmed at your request and cannot be canceled without beneficiary's consent." This started a lengthy and immaterial correspondence, in the course of which, referring to the impossibility of revoking the letter of credit after confirmation, Pan-American wrote that "we carefully note what you say and confirm your understanding of the matter." Efforts were made through the Rio branch to cancel the credit, but Barcellos insisted upon it. Finally, on September 4th, Pan-American wrote City Bank, inclosing copies of cable messages showing trouble between Barcellos and Seago, and adding: "In view of these cables, we must positively decline to honor any drafts of Hermanos Barcellos against this credit."

On September 18th and 28th Barcellos tendered to the Rio branch drafts with accompanying c. i. f. documents, which practically exhausted the credit. Down to this time, Pan-American had never given any reason for refusing to honor Barcellos' drafts, except that the latter had committed some breaches of contract with Seago. Barcellos' documents were accepted, his drafts negotiated, and in due time presented to the home office of the City Bank and there paid. The sugar came forward, so far as appears, in safety, but by the time it arrived sugar speculation was at an end. The sugar, instead of being worth 18 cents a pound, was sold for a small fraction of that amount. Seago was insolvent, and the Pan-American refused to pay. Whereupon, in December, 1920, this action was begun. Its technical nature and the defenses thereto and some further facts will be adverted to in the opinion. After a lengthy trial a verdict was directed for the City Bank, and Pan-American took this writ.

Rounds, Hatch, Dillingham & Debevoise, of New York City, Eugene J. McGivney, of New Orleans, La., and Francis E. Neagle, of New York City (Ralph S. Rounds, Eugene Congleton, and Raymond E. Cook, all of New York City, on the brief), for plaintiffs in error.

Shearman & Sterling and Carl A. Mead, all of New York City (John A. Garver and Justus Sheffield, both of New York City, on the brief), for defendant in error.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). At the very threshold of this matter the parties disagree as to its nature. Pan-American describes it as an action "upon a commercial letter of credit," while the other side insists that it is brought on an agreement by Pan-American to reimburse City Bank for whatever it paid out on such promise of reimbursement. The difference is more than a technicality, for the nature of any legal procedure is determined by the pleading. That pleading may be bad, but, good or bad, the pleas dominate the evidence, and define or delimit the scope of the pleader's efforts.

Thus measured, the City Bank is right in its characterization of the proceeding, for the complaint sounds solely upon the *request* of Pan-American that City Bank issue a certain letter of credit. Compliance with that request is then averred, and the pleader concludes by resting on the legal implication that Pan-American should pay the cost of compliance with request. Our first inquiry, therefore, is as to what promise or agreement was made by Pan-American. There is here no question of fact as to what was said or done; everything is in writing; such differ-

ences as exist arise from differing interpretations of written words.

[1] It is true that in the exchange of letters and telegrams the word "guarantee" is continually used; we may even assume that, if the men of affairs who composed the various writings had been asked (before the price of sugar fell and counsel were consulted) what they had done, the answer might have been that Pan-American had guaranteed payment by some one of a letter of credit. But it is clear that the legal effect of what men do is not determined by the names they affix to their deeds. The essential nature of their acts determines, and the law has its own names for the results they achieve. Border Bank v. American Bank (C. C. A.) 282 F. 73; Second National Bank v. Columbia, etc., Co. (C. C. A.) 288 F. 17, ·30 A. L. R. 1299. Undoubtedly the names by which men describe their acts are evidence of the nature of their doings, often strong evidence; but acts control names, and that deeds speak louder than words is good law.

[2] We can therefore unhesitatingly hold that the result of the paper writings in evidence was not that Pan-American guaranteed anything; i. e., agreed to answer for the performance of some obligation in the case of another's default. On the contrary, it did undertake and promise to pay City Bank whatever it lawfully paid, the premises considered, plus one-eighth of 1 per cent. This holding renders unnecessary consideration of the cases regarding guaranties by corporations and especially by banks operating under either the National Banking or Federal Reserve Acts. See Border Bank Case, supra; People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907; Cochran v. United States, 157 U. S. 286, 15 S. Ct. 628, 39 L. Ed. 704; Coal & Iron Bank v. Suzuki (C. C. A. 2d), 3 F.(2d) 764, opinion filed November 3, 1924.

[3] More specifically, we hold that the legal relation of parties is quite fairly summarized in Pan-American letter to City Bank of May 25th, declaring that "We have opened for account of Seago & Co. a credit through you," meaning that Pan-American had given Seago credit, by means of asking City Bank to use its Brazilian branch to put the arrangement through, while the drafts drawn against the credit might be presented for payment either "to you in New York or to us here"—in New Orleans. The essential nature of the transaction becomes plain, and even simple, when its development is noted; for what Pan-American wanted to do for its customer, Seago, was to issue its own letter of credit available to Barcellos in Brazil. It yielded to the obviously truthful suggestion that its own promise for so large a sum was hardly available in Rio de Janeiro, and it therefore procured City Bank to do for it what business, not legal disabilities, prevented its doing for itself. A plainer reimbursement contract, enforceable in assumpsit, it is hard to imagine.

[4] To this Pan-American answers that the undertaking was on its part ultra vires, a defense which we will assume may be presented, though it appears for the first time in an amended answer served some months after action begun, and bears no relation to the reasons advanced on September 4th for Pan-American's anticipatory breach of any and all contracts giving rise to liability on the Barcellos credit. Examination of this defense reveals two branches thereof; one that Pan-American as a bank could not contract, and the other that Wuerpel as representing the bank had no authority to contract.

The first objection is disposed of by the above analysis of the contract made, for it is undoubted that Pan-American had perfect chartered authority to issue its own letter of credit to Barcellos; no legal reasons existed against such action, and that course was plainly the original intent of the New Orleans parties concerned. If, then, Pan-American could issue its own letter, it could agree with City Bank to reimburse payments made by the latter on the letter actually issued; a document not differing legally from that originally proposed, but from a business standpoint more available where Pan-American wished it used. This was the commercial as well as the legal relationship with each other voluntarily assumed by the parties hereto, a position very different from that recently discussed in Nowell v. Equitable, etc., Co., 249 Mass. 585, 144 N. E. 749, a decision upholding the defense of ultra vires to an action upon a plain and inescapable guaranty.

The second objection we reject on the facts, which uncontradictedly show a course of business by which for purposes of commercial credit Mr. Wuerpel had full authority to act for Pan-American. Discussion of evidence would yield no legal rules; there was not enough testimony impugning Wuerpel's authority to submit to a jury. His judgment in selecting customers like Seago was and is immaterial. The method or means of fulfilling the contract now fully described required consideration.

The Rio branch of City Bank existed under the Act of December 23, 1913, and its

amendments (U. S. Comp. Stat. § 9745). That statute requires, inter alia, that national banks having foreign branches "shall conduct the accounts of each foreign branch independently of the accounts * * * of its home office, and shall at the end of each fiscal period transfer to the general ledger the profit or loss accrued at each branch as a separate item." That is, the branch is not a mere "teller's window"; it is a separate business entity.

[5, 6] To such a branch the home office gave instructions by the cable of May 26th to "negotiate sight drafts" as drawn by Barcellos, if accompanied by proper documents. The word "negotiate" is technical, it has received much exposition (see Words and Phrases, First and Second Series); but the result is expressed in the Negotiable Instruments Law (section 60 of N. Y. Act [Consol. Laws, c. 38]), which sums up judicial exposition by declaring that an "instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof." Consequently, when the Rio branch, in fulfilling instructions, acquired from Barcellos his drafts drawn on the home office in New York, it "negotiated" them, and became (as no one doubts) the holder thereof, and a holder for value.

But the Rio branch, in so becoming a holder of the drafts, and then sending them to New York for collection, assumed the same relation to its home office that any other bank or person that had similarly negotiated the paper would have assumed. In fact, as the evidence shows, the drafts and accompanying documents went from the Rio branch to the New York home office with a demand for credit; i. e., a demand for payment, and payment by the demanded credit was given the branch. This was just what the cited act of Congress in effect requires, and illustrates the rulings that, in respect of the collection of forwarded paper, branches and a parent bank are to be considered as separate entities. Woodland v. Fear, 7 E. & B. 519; Clode v. Baylay, 12 M. & W. 579; McNeil v. Wyatt, 3 Humph. (Tenn.) 125, considering the point generally; U. S. Bank v. Goddard, 5 Mason, 366, Fed. Cas. No. 917, under the statutes regulating the Bank of the United States; and Chrzanowska v. Corn Exchange Bank, 173 App. Div. 285, 159 N. Y. S. 385, affirmed 225 N. Y. 728, 122 N. E. 877, under statutes regulating banks chartered by the state.

Thus the case presents a legal problem identical with the common one resulting from discount by any indifferent dealer in commercial paper of such a draft as Barcellos', and presentation by such dealer of the draft to the drawee for payment. An instance is International, etc., Corp. v. Irving Bank (C. C. A.) 283 F. 103. We think it unnecessary to go over again the rules laid down regarding drafts drawn under commercial credits and accompanied by documents evidencing a c. i. f. transaction. Our views as to these rules and the meaning of "c. i. f." have been stated in the case last cited, and in Klipstein v. Dilsizian (C. C. A.) 273 F. 473, Harper v. Hochstim (C. C. A.) 278 F. 102, 20 A. L. R. 1232, American, etc., Co. v. Irving, etc., Bank (C. C. A.) 266 F. 41, and Old Colony, etc., Co. v. Lawyers', etc., Co. (C. C. A.) 297 F. 152.

Thus the question is this: Did the Rio branch obtain with Barcellos' draft the papers and all of them evidencing a c. i. f. sale as required by the cable of home office to Rio of May 26th, supra, viz. invoices, private and consular, insurance certificate, and bills of lading? This cable is practically the letter of credit; neither the piece of paper called credit 17504, nor a copy of it, could have gotten to Rio before Barcellos was notified and the transaction closed, so far as contract making was concerned. To vary the statement, we think the point may accurately be put as follows: If John Doe had negotiated Barcellos' draft and received his papers, and Doe should have recovered from City Bank on the draft, then the bank can recover from Pan-American on the latter's reimbursement contract.

This view affords to plaintiff in error opportunity to object to the sufficiency of every paper presented, and to most of those objections we shall not advert; they have been observed, and that is enough. The correctness of the ruling below depends, in our judgment, on two arguable matters: (1) Were the bills of lading accepted such as the letter of credit required; and (2) was the insurance of the sort demandable?

The bills of lading in Portuguese recite: "Loaded by the Senhor Hermano Barcellos on board of the steamer Tocantins, * * * at present anchored in the port (or in another steamer belonging to the Lloyd Brasilero or chartered by them), * * * the packages noted on the margin to be transported to New Orleans." The policies of insurance distinctly cover only sugar on the Tocantins, and are expressed in Brazilian currency "equivalent to (so much) American gold at the exchange rate of 5 $720 per dollar."

[7] It is obvious that, taken literally as translated, the bills of lading say no more than that the sugar is on board some steamer of the line, not necessarily the Tocantins, while the insurance is invalid unless the sugar was on the Tocantins. There is a further objection to the insurance, to the effect that it is not "dollar" insurance. On this last point we are of opinion that the contract did not require insurance expressed in any particular currency; it impliedly demanded sufficient insurance and that by the evidence was afforded by the policies complained of. We are not impressed by the suggestion that, because the credit was in dollars, the insurance *must* be in dollars; it is enough at present to say that we see no indication in this transaction of any such intent of parties. Scott v. Barclay's Bank, 14 Lloyds List, 89 and 142.

As to the rest of the objection, it is not accepted as an answer that the goods did in point of fact go on the Tocantins, that it was plainly the intent to put them there, and that before drafts were presented in New York the legal relation of the sugar and the Tocantins was exactly what it would have been under an ordinary "received on board" bill. The legal rights of parties must rest on the papers, and on nothing else, because it was a part of the agreement that the papers to accompany the drafts were to show a c. i. f. sale.

The question whether by usage "received for shipment" bills of lading may be accepted, or whether the drawee may insist on "received on board" bills, received much consideration in Vietor v. City Bank, 200 App. Div. 557, 193 N. Y. S. 868.[1] The present case is unlike the one last cited, because the bills .here are not "received for shipment" bills at all; they recite actual lading on some vessel of the carrying line; they are "on board" bills of some vessel, but not (it is said) of any particular vessel.

[8] It is doubtless true that, when the parties hereto agree, as they did in the United States, that certain documents were to be the test of a transaction (i. e., negotiation in Brazil), it was their intent that the documents should correspond and comply with Brazilian law and usage. Furthermore, the parties agreed with reference to a particular nexus of trades; i. e., the shipping and sugar trades. At this bar, Pan-American argues

that it at least had the right to have a jury find that it was aware of any usage or custom to which the (e. g.) bills of lading might conform, or by which they might be validated. This is incorrect; Pan-American agreed that City Bank should do certain things, and that necessarily implied that the bank should act in accordance with such laws, customs, and usages as it encountered in the place or places where the promise was to be and was fulfilled. Neer v. Lang, 252 F. 575, 164 C. C. A. 491; Eames v. Claflin, 239 F. 631, 152 C. C. A. 465.

Doubtless it might have been made a condition precedent to the payment of any draft under the credit letter that the c. i. f. documents must conform to some particular legal standard; e. g., that of New York. Such requirement would possibly have been no more onerous than those actually inscribed in the credit litigated in American, etc., Co. v. Irving Bank, supra; but nothing of the kind was here done. Obviously such an obligation would markedly restrict the availability of commercial credits in the very places where they are most needed, and bankers wish to sell them. Consequently, if a bill of lading (e. g.) is required as a document, it means a bill good by law for its intended purposes where it is issued, and/or by custom of the trade to be served, which custom may and usually does cover transit from shipping port to delivery point. It follows that we treat these documents as measurable by the results of investigating the law of Brazil and the custom of the trade as proven.

As for the suggestion that this case turns on the sufficiency of the tender in New York, when the draft was there presented, we observe that such doctrines (taken literally), seems to let in inquiry as to what the papers meant at time of presentation, and *then* the sugar was undoubtedly on the Tocantins en route for New Orleans; but much more important is the result, above enlarged upon, that no one negotiating a draft to be so interpreted can, by any reasonable exercise of intelligence, know whether what he buys in Tokio or Rio will be good in New York or London, and this makes a mere trap out of what is intended to be an aid to commerce.

The Brazilian law, therefore, we treat as a fact to be proven, including the effect of usage or custom under or on that law, and we regard it as proven beyond peradventure that the bills of lading here in question were in universal use in Rio de Janeiro, were the standard form of the Lloyd Braziliero, and were recognized as valid under local law. In the export trade, also, it is proven that bills

[1] This decision resulted in new trial conducted presumably in accordance with directions given. The resultant judgment for plaintiff was affirmed without opinion in 206 App. Div. 664, 199 N. Y. S. 955, and 237 N. Y. 538, 143 N. E. 733.

such as these were the only bills known at the American end of Brazilian trade, and were commonly used and accepted in c. i. f. transactions.

Applying the foregoing to this case, it is to be remembered that by special agreement between the parties "neither the City Bank nor its correspondent in Brazil [was] responsible for the correctness or genuineness of documents," and Barcellos tendered together the bills of lading in the form above given and the insurance covering on sugar on board the Tocantins, and the bills were printed forms, except for the word "Tocantins" written in.

The Rio branch was then justified in what it did by the usage of the place and trade, and by the representations of documents furnished by Barcellos, which, considered together, represented to even a most cautious mind that the sugar was on board the Tocantins; for Barcellos offered a set of papers which in terms asserted that Barcellos had put it there. No other interpretation could be given to such a bill confirmed and explained by the insurance policy. It may be granted as immaterial that the representations were substantially true, or that, when the goods sailed and the drafts arrived in New York, the papers were perfect muniments of title to sugar actually on the Tocantins. We hold that, under contract made, the usages of the trade, and Brazilian law, the Rio branch, regarded as an independent purchaser of the drafts, bought a good claim against the City Bank, and that therefore that bank has a good claim against the Pan-American.

If, as is argued for defendant below, this lays down a measure of liability on the part of City Bank, which it would be loath to assume, were not the negotiator its own branch, answer is that the remedy is in its own hands; it may insert conditions in credit letters which will both safeguard its own coffers, and limit its sale of credit to those learned in legal intricacies.

[9] We have observed one other contention of defendant below, that the credit to Barcellos was conditional and was revoked. We are of opinion that by express agreement it became irrevocable as soon as the Rio branch communicated its terms to Barcellos; from that moment Barcellos had contractual rights against City Bank. What would have been the position of the Rio branch, if it had refused to negotiate, is not before us for decision.

To conclude, the evidence given was of such a nature that any verdict for Pan-American should have been at once set aside; therefore the direction for plaintiff below is correct.

Judgment affirmed, with costs.

HAND, Circuit Judge (dissenting). I agree that paragraph 5 of section 13 of the Federal Reserve Act (Comp. St. § 9764) applies only to acceptances proper; that is, to acceptances payable on time, and not to sight drafts. The language seems to me clear, and the Reserve Board has so ruled. That there may be substantial differences between the two I am quite ready to believe, if for no other reason, at least because the draft being uncleared for a period of time subjects the acceptor to the intermediate fluctuations of the buyer's credit and in the value of the goods. My trouble arises from the fact that the defendant's obligation was certainly intended as a guaranty in accommodation of Seago & Co. and prima facie was ultra vires. I attach no importance to the fact, which I admit, that it was the defendant, and not Seago & Co., who was to repay the drafts when presented after payment by the plaintiff. That it is true is a distinction between the case at bar and Nowell v. Equitable Trust Co., decided in September, 1924, by the Supreme Court of Massachusetts (249 Mass. 585, 144 N. E. 749), but it is irrelevant.

A creditor may always come first upon the guarantor, ignoring the principal, if he chooses, leaving the former to throw the eventual loss upon the latter where it belongs. Cochran v. U. S., 157 U. S. 286, 296, 15 S. Ct. 628, 39 L. Ed. 704; Eichel v. U. S. F. & G. Co., 241 F. 357; Id., 245 U. S. 102, 38 S. Ct. 47, 62 L. Ed. 177; American Surety Co. v. Lawrenceville Cement Co. (C. C.) 96 F. 25. So much is this true that the creditor's forbearance, short of an agreement to forbear, does not prejudice his right. Greenway v. Orthwein, 85 F. 536, 29 C. C. A. 330 (C. C. A. 8). Hence the agreement that the defendant should honor the drafts, which, as it chances, was quite dehors the formal agreement, made no difference in the relations of the parties. The relation of suretyship depends, not on the order of collection, but upon the eventual incidence of the loss. None of the distinctions raised by the plaintiff serve in the least to differentiate Nowell v. Equitable Trust Co., supra, which is clearly in point, and the only case so far as I know which decides the question.

The gist of the matter is whether the power to issue letters of credit reasonably covers such a guaranty. The Louisiana statute gives such banks as the defendant the power

"to issue letters of credit authorizing the holders thereof to draw drafts upon them or their correspondents at sight or on time." Act No. 184 of 1916, § 30. That power, of course, would have authorized the defendant to issue the letter, if that would have satisfied Barcellos, and it would also have authorized the defendant to make the plaintiff one of its correspondents or drawee banks on whom Barcellos might have drawn. Had he in fact drawn on the plaintiff, the defendant must have paid the drafts, by virtue of the implied agreement between them arising from the very nature of the transaction. The agreement on which the plaintiff's rights would rest in that case appears to me indistinguishable in substance from that on which it sues in the case at bar. The strength of the plaintiff's case, therefore, rests upon the argument that, since the defendant concededly had the power to make the plaintiff its correspondent, and thus to subject itself to precisely the same hazard as it in fact undertook, the difference is only one of form. People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907.

I have tried to state this position as fairly as I can, because it has apparent cogency, and it is only, I think, by considering more narrowly the functions of a letter of credit that it can be answered. An irrevocable commercial import letter is designed to do more than give the seller a chance to cash his drafts when the time arrives. Granting that the law is not as yet clearly worked out, it is certain, at least in this circuit, that, when once communicated to the seller, the letter creates a contract which is in fact irrevocable. American Steel Co. v. Irving National Bank, 266 F. 41 (C. C. A. 2). The seller may proceed to buy or manufacture the goods, relying upon the credit of the writing bank, which is his security. Hence it makes a great difference to the seller who is the writer. Since the correspondents named in such a letter make no promise, the seller may not look to them, but has only the credit of the writer. It was therefore quite another thing for the plaintiff, with its far stronger credit and wider reputation, to write the letter than for the defendant. Yet, as far as I can see, this action cannot succeed, unless we ignore the difference.

The case at bar is as good an illustration as one could ask. It is apparent that, had the defendant tried to satisfy Barcellos with its own obligation, it would have failed, and it could never have incurred the risk which has proved too much for its resources. It was only by persuading the plaintiff to give Barcellos the intermediate assurance that his drafts would in fact be honored when presented that the defendant could get itself involved in the transaction at all. True, it had to persuade the plaintiff to accept its guaranty, but that was quite another thing, as this case proves. I submit that, when the practical consequences of the difference in the legal relations are so important, we should not treat them as only formal. Rather we should say that, when the charter gave the defendant the power "to issue letters of credit," it meant to allow no more than the use of its credit, so far as that would be accepted, and did not allow it by means of a collateral guaranty to assume far larger commitments. The words must be read to mean what they do in common commercial use. So read, they do not include a transaction of the kind undertaken. To extend them was to offer to the defendant's officers opportunities for speculative ventures to which the shareholders never agreed when they organized the bank. So it seems to me no answer to say that the defendant might lawfully have written a letter which, if accepted by the seller, would have put it just where it now is. It could not in fact have got into that position, because, had it followed the fair import of its power, nobody would have trusted it so far. Thus, the guaranty was ultra vires, and the Supreme Judicial Court of Massachusetts was right in so holding. I have said that, so far as I know, there are no contrary decisions, and it remains only to discuss those which the plaintiff cites.

In Border Bank v. American National Bank, 282 F. 73 (C. C. A. 5), the seller, Maldonado, required security of the buyer. The defendant (plaintiff in error) was the buyer's bank, and sent to the plaintiff (defendant in error) a wire guaranteeing the seller's draft. Had the plaintiff on the faith of that wire written a letter of credit to Maldonado, the seller, the case would have been on all fours with that at bar, but it did not. On the contrary, the plaintiff was Maldonado's own bank, and it was on that account that the wire was sent to it. It had written a letter of credit on Maldonado's account, to secure his purchase from Amsinck of the sugar necessary to fill the contract which the defendant secured, and it had honored Amsinck's drafts, so that it had at least a banker's lien, perhaps more. Apparently, also, it discounted Maldonado's draft upon the defendant or the buyer, but it had not, so far as appears, issued to Maldonado an irrevocable letter of credit, on the faith of which Maldonado made the sale.

Thus it is plain that the case is in no sense parallel with this, but, on the contrary, that all it involved or could involve was the question whether the defendant's wire was truly a letter of credit, in spite of the fact that it was called a guaranty. There ought never to have been any question of that. In the case at bar the defendant's guaranty was, of course, nothing of that sort. It was not given to the seller, Barcellos, and never came to his knowledge; nor was it given to Barcellos' bank as security for the discount of his drafts when he should draw them. The facts were in substance the same in Second National Bank v. Columbia Trust Co., 288 F. 17, 30 A. L. R. 1299 (C. C. A. 3), except that it does not appear that the plaintiff who was the seller's bank had discounted his drafts. The court took the point in its discussion of the difference between a letter of credit *with* the plaintiff and one *by* it. Bank of Italy v. Merchants' National Bank, 197 App. Div. 150, 188 N. Y. S. 183, concerned a similar transaction.

Finally, the plaintiff argues that it was the defendant's agent to write the letter, and that the defendant had power to do by an agent what it might do directly. I make no question that the defendant might have authorized the plaintiff to write such a letter for it, but it did not. The letter was not the defendant's, but the plaintiff's, and engaged its credit alone, as was essential to the success of the enterprise. When a man acts through an agent, he must mean the resulting rights or duties to be his own, and the agent must intend to commit, not himself, but his principal, to the person with whom he deals. Here there was nothing but a request and a guaranty, and the parties had no purpose to bind the defendant to Barcellos. We must not be deceived by the anomalous doctrine of the undisclosed principal, though even for that there must also be a true agency. It is hard in so plain a case to say more than that the parties never meant to create an agency.

But, if I am wrong upon this point, as well may be, it seems to me plain that the documents presented to the plaintiff in New York did not conform with the letter of credit which it wrote, and for payments under which alone the defendant agreed to reimburse it. We have too often committed ourselves in this court to the doctrine that the obligation of the writer is measured by the conformity of the documents with the letter of credit to recede from that position. American Steel Co. v. Irving National Bank (C. C. A.) 266 F. 41; International Banking

Corp. v. Irving National Bank (C. C. A.) 283 F. 103; Old Colony Trust Co. v. Lawyers' Title & Trust Co. (C. C. A.) 297 F. 152. My brothers are as decided in that opinion as I. So we have to determine whether the documents presented were a valid tender under the conditions which Barcellos had to perform. I shall assume that the bill of lading was good enough, taken by itself, though it was plainly no more than an acknowledgment that the goods were laden on the Tocantins or some other vessel of the carrier's fleet. However that may be, it was of course a sine qua non that the insurance must cover the goods. If so, I submit that none of the policies were in form. Each was a valid insurance only if the Tocantins in fact lifted the goods, and yet the bill of lading was equally satisfied by a shipment on some other vessel. Presented together, the two documents came only to this: The goods are on board either the Tocantins or some other vessel of the line, and they are insured if they are on board the Tocantins.

Such documents are certainly an incomplete tender upon a letter of credit to secure a c. i. f. sale. The buyer is entitled to complete protection, and either the bill of lading should have been narrower or the policies broader; as they stood, they did not match. The allowance in the guaranty for any defect in the correctness and genuineness of the documents does not cover such a hiatus, or excuse the writer for accepting such papers as on their face were insufficient. It protected the plaintiff only against forgery and mistakes of fact in their contents. Were it not so, the guarantor and the person taking out the letter could be held, whatever the writer chose to accept. That would in effect nullify the whole theory of the transaction.

Further, it is no answer to say that the Tocantins in fact lifted the sugar, and that the policies had become valid before the drafts reached New York. The bargain was to honor the drafts when the papers were in form, and plainly we may not, consistently either with principle or with our past rulings, make the writer's obligation depend upon what he may learn dehors their borders. Unless we are prepared to say that a writer may be bound to honor drafts because in fact the seller has performed, I do not see how we can hold the defendant here. In short, there must be some independent law or custom which makes such documents a valid tender under a c. i. f. sale.

And so the question comes up as to what law governed the sufficiency of the tender. That under general principles was the law of

the place of performance. My brothers believe that the Rio branch is to be regarded like any independent holder in due course of Barcellos' drafts, and that the place of performance was New York. This, too, is the plaintiff's argument. If so, I do not see any escape from holding that the case turns upon the sufficiency of the tender in New York in October, or how the law or customs of Brazil can be material. No custom could in my judgment charge the writer of a letter of credit with the obligation of honoring drafts supported by such documents as these. After all, there is a limit to what one may incorporate into a contract by custom, and to say that in a c. i. f. sale the buyer's protection is dependent upon the choice of the carrier in selecting the ship seems to me to deny the most important provision of the contract. If such a custom were tolerable, the buyer's money might be advanced in direct opposition to the terms which he has exacted. Judged, therefore, as the plaintiff asks us to judge it, and as my brothers conceive it, the transaction at bar is not affected by custom anywhere, or by the laws of Brazil.

If, on the other hand, the contract be interpreted so that the place for presentation was Rio, still in my judgment the same result follows. That interpretation would indeed be plainly impossible if the blank form of the letter of credit controlled, because that expressly provided for presentation in New York. However, Barcellos never saw it, and the only true letter ever issued was that which the branch delivered to him on June 5th. The important part of that was the plaintiff's wire to the branch which the letter incorporated. This read as follows: "Negotiate sight drafts up to $815,000 dollars U. S. Cy. On the National City Bank of New York, New York." It is, of course, true that, once the branch had negotiated the drafts, following this direction, any loss would eventually fall on the plaintiff. Yet, even if one were to ignore the word "negotiate," and treat the letter as authorizing Barcellos to hold the branch merely as an agency of the plaintiff, and to present the drafts for honor to it, still I think the parties meant the documents to be in form for a presentation valid in New York. This appears to me to follow, both from the direction to negotiate itself, and from the requirement that the drafts must be drawn on the plaintiff at New York. The form controlled the substance, because the substance was the form.

Besides, while the defendant learned of the wire and must be taken as assenting to it, certainly the plaintiff gave no intimation that the original form of the guaranty was to be changed in this respect. The defendant at least was justified in supposing that the documents to be honored were such as would constitute a valid tender, where the drafts were to be presented for honor, not where Barcellos should negotiate them. Hence it appears that, even if I were not to take the plaintiff's own version of the transaction, the sufficiency of the documents must still be determined by the law of New York, and that the law or custom of Brazil does not play any part in the case. For these reasons I cannot agree with my brothers that the plaintiff's evidence is material as to custom and the like in Brazil. It might be, indeed, if Barcellos' performance was to be in Rio, or, if in Rio, were not to be judged by the law of New York, but it could not under the view that we all take of the transaction.

While it is true that the plaintiff seeks to recover, the question is really whether it could have been forced to pay Barcellos. It is the liability of banks in such cases that is up, and I cannot help believing that the result of this decision is to extend their responsibility beyond the bounds which they have the right to set. In cases like this they must mean to reserve the right to judge whether the beneficiary of the letter has complied with its terms under the law of the place where he must present his papers, and they would quite rightly be the first to protest if they were held because of outside facts which they might or might not know, and the evidence of which might be inconclusive or dubious. Since such business is done in large volume, and must be conducted with speed, I submit that they must be permitted to decide upon their liability by a mere inspection of the accompanying papers. That is generally a requirement; it is especially so of a c. i. f. sale. It seems to me that we are assisting the plaintiff out of an unfortunate and disastrous error of one of its agents at the expense of a principle, which it must itself in the long run be especially interested in maintaining.

Finally, there is the question of the currency in which one of the policies was written. I should hesitate to say that, under a letter of credit securing a c. i. f. sale in dollars, a policy in any other currency would be a good tender; but I rather incline with my brothers to interpret this one as being in fact a dollar policy, especially considering the fact that it was intended to secure a shipment to the United States. However, that question I need not answer, because my views are in any event not to prevail, and I have

already said enough, perhaps too much, to show why I think the defendant is entitled to a new trial. Indeed, it is only because of the unfortunate predicament of the plaintiff, and the departure, as I view it, from the established rules relating to letters of credit, which have of late become so important in this court, that so long a dissent is justified, if it be justified at all.